UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
S.H.N FINANCIAL INVESTMENTS LTD.,
                    *Plaintiff*,

      v.

ENLIVEX THERAPEUTICS LTD.
                    *Defendant*.
---------------------------------------------------------------- x

1:20-cv-3726

**COMPLAINT**

      Plaintiff S.H.N Financial Investments Ltd., d/b/a Shamir Capital ("Plaintiff" or "Shamir"), by and through its attorneys, Feuerstein Kulick LLP, hereby files its complaint against Defendant Enlivex Therapeutics Ltd. ("Defendant", "Enlivex" or the "Company"), and alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys that included, a review of Defendant's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by Defendant, analysts' reports and advisories about the Defendant, and information readily obtainable on the Internet.

**NATURE OF THE ACTION**

    1.    This action seeks money damages and other relief arising out of Defendant's egregious and fraudulent misconduct in connection with the Company's registered direct offering that closed on February 26, 2020 (the "February Offering").

    2.    As set forth more fully below, the February Offering offered investors 1,000,000 registered shares of the Company at a price of $8 per share, which was below the market price of the Company's common stock. Upon receiving information concerning the February Offering, Shamir specifically asked the Company whether the Company was willing to issue common stock

1

warrants in addition to the registered shares.

3. In response to Shamir's request, the Company unequivocally stated that it would not include warrants as part of the February Offering and the Board was against any such grant because it was too dilutive to existing shareholders. The Company further told Shamir that it had rejected a similar request from another potential investor – who wanted to invest more than $8 million – because (i) the Board was against issuing warrants, and (ii) the Company did not need more than $8 million in capital.

4. The February Offering included a securities purchase agreement dated February 24, 2020 (the "SPA"), pursuant to which the Company represented and warranted in the SPA that:

   a. "[T]here are no . . . commitments of any character . . . giving any Person any right to subscribe for or acquire, any Ordinary Shares or the capital stock of any Subsidiary, or contracts, commitments, understandings or arrangements by which the Company . . . may become bound to issue additional Ordinary Shares or Ordinary Share Equivalents or capital stock of any Subsidiary."

   b. There is no "event, liability, fact, circumstance, occurrence or development that has occurred or exists or is reasonably expected to occur . . . that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed to be made that has not been publicly disclosed."

   c. "All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company . . . does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."

5. In addition, the Company covenanted in the SPA that it would not "effect[] or enter[] into an agreed to effect the issuance by the Company . . . of Ordinary Shares or Ordinary Share Equivalents . . . involving a Variable Rate Transaction," which was defined as any transaction whereby the Company "issues or sells any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional Ordinary Shares . .

. with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security upon the occurrence of specified or contingent events directly related to the business of the Company."

6. Based on the Company's representations and covenants in the SPA, and the Company's explanation for rejecting Shamir's request for warrants, Shamir agreed to invest in the Company and acquired 300,000 shares of the Company's common stock at $8 per share.

7. But *a mere four days after the February Offering had closed* (*i.e.*, on March 1, 2020), the Company executed a new securities purchase agreement with a new, and different, group of investors (the "March Offering").  Pursuant to the terms the March Offering, the Company offered these new investors (i) 2,093,750 shares of the Company's common stock, *and* (ii) two-year warrants that entitled the holders to purchase an additional 2,093,750 shares at $9 per share.  Pursuant to the terms of the March offering, each share of common stock was sold with a warrant to purchase one share of the Company's common stock (at an exercise price of $9 per share) at a combined offering price of $8 per share and warrant (which was less than the closing price for each share of common stock as of February 28, 2020).

8. Upon information and belief, the Company knew of, and/or was negotiating, the March Offering *before* the February Offering had closed.  Thus, the representations contained in the SPA and made by the Company were false and misleading when made.  Moreover, by issuing the March Offering, the Company breached its covenant not to enter into any "Variable Rate Transaction" as the Company defined that term in the SPA.

9. But for the Company's representations and covenants in the SPA, Shamir never would have invested in the February Offering.

10. The Company's misconduct gives rise to claims for securities fraud (pursuant to

Section 10(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of contract and common law fraud. Accordingly, Shamir now seeks a judgment awarding it (i) money damages in an amount to be determined at trial but in no event less that $2.4 million, and (ii) whatever further relief the Court deems just and proper.

## THE PARTIES

11. Plaintiff S.H.N Financial Investments Ltd., d/b/a Shamir Capital, is an Israeli based hedge fund with a registered address at 8 Abba Even Blvd, B Entrance Herzliya, 46733, P.O. Box 2181, Israel.

12. Upon information and belief, Defendant Enlivex Therapeutics, Ltd. is an Israeli based company with a registered address at 14 Einstein St., Nes-Ziona, 7403618, Israel.

## JURISDICTION AND VENUE

13. This action arises under Sections 10(b) and 10(b)5 of the Exchange Act, 15 U.S.C §78j(b), §78r, §78(t)a, 17 C.F.R. §240.10b-5, and state law.

14. This Court has subject matter jurisdiction over the action pursuant to Section 27 of the Exchange Act, 28 U.S.C§§ 1331 and 1337. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. The transactions, acts, practices and courses of business alleged herein took place within the Southern District of New York, including because, Defendant used electronic communications and other interstate facilities to communicate with and disseminate false and misleading statements to Enlivex shareholders in the Southern District of New York. The shares of Enlivex are publicly traded in this District on the National Association of Securities Dealers Automated Quotation System (NASDAQ) stock market.

16. Venue is also proper because Section 5.9 of the SPA provides, in relevant part that "[e]ach party agrees that all legal Proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and the other Transaction Documents . . . shall be commenced exclusives in the state and federal courts sitting in the City of New York. Each party irrevocably waives personal jurisdiction of process and consents to process being served in any such Action or Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notice to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof."

## FACTS UNDERLYING PLAINTIFF'S CLAIM

### *The Company's Business*

17. Enlivex is a clinical stage, immunotherapy company that purports to be developing an allogeneic[1] drug pipeline for immune system rebalancing (which is critical for the treatment of life-threatening immune and inflammatory conditions which involve hyper-expression of cytokines . . . and for which there are no approved treatments (unmet medical needs), as well as solid tumors immune-checkpoint rebalancing."

18. On or about November 20, 2019, the Company filed a Prospectus Supplement with the SEC pursuant to Rule 424(b)(5) of the Securities and Exchange Act of 1933.

19. On the following day (*i.e.*, November 21, 2019), the Company withdrew its proposed offering.

20. As the Company stated in a press-release that it issued on or about November 21, 2019, the Company withdrew its proposed offering because "the Company currently believes it is

---

[1] The term "allogeneic" means "taken from different individuals of the same species."

not in the best interest of its shareholders to raise equity capital in the current market environment. The Company remains well capitalized with cash and cash equivalents, together with short term deposits, of approximately $13.5 million as of September 30, 2019, which the Company believes will be sufficient to fund its current operations through the beginning of the second quarter of 2021."

21.     A few months later, in February 2020, Enlivex announced that it was "plan[ning] to increase its manufacturing capacity of Allocetra$^{TM}$, . . . in preparation for potential requests for treatment of coronavirus (COVID-19) patients who are hospitalized with diagnosed organ dysfunctions or failures related to coronavirus."

22.     At or around the same time, the Company set out to raise additional capital through a registered direct offering such that it would have additional funds to use for, *inter alia*, clinical, regulatory, manufacturing and research and development activities.

***The Company's Code of Ethics and Disclosure Policy***

23.     As set forth on the Company's website, Enlivex maintained a "Code of Business Conduct and Ethics" (the "Code of Ethics") (*see* www.enlivex.com) that states, among other things, that "Enlivex is committed to the ideals of uncompromising honesty and integrity.  As an Enlivex Associate you are expected to adhere to the highest standards of ethics; to be honest and ethical in dealing with each other, with shareholders and with customers, vendors and all other third parties."

24.     The Code of Ethics further provides that "all financial managers are expected to uphold the following standards:  To provide information that is accurate, complete, objective, relevant, timely and understandable. . . .To act in good faith, responsibly, with due care, competence and diligence, without misrepresenting facts or allowing their independent judgments

to be subordinated."

25. The Code of Ethics also refers to a "Disclosure Policy" (the "Disclosure Policy"), which is also maintained on Enlivex's website, that states that one of the Company's core tenants is to "provide all interested parties with fair and equal access to factual information about our businesses and our strategic objectives, in order to enable investors to reasonably gauge the performance of the Company as a whole."

26. The Disclosure Policy further states that "the objective of this Policy is to ensure that public communications about material events or developments concerning Corporation are timely, accurate and broadly disseminated in accordance with all applicable legal and regulatory requirements."

27. Finally, the Disclosure Policy notes that it is intended to cover "all material disclosures". The Company defines the term "material" as information that "a reasonable investor would consider . . . important in making an investment decision regarding the purchase or sale of the Company's securities" or information that "if made public, would likely affect the market price of the Company's securities."

28. The Company also identifies "[n]ew equity or debt offerings" as an "example[] of information which is deemed to be material."

***Defendant Fraudulently Solicit Plaintiff's Investment in the SPA***

29. On behalf of the Company, the Company's placement agent, H.C. Wainwright & Co., contacted Shamir about participating, in the Company's contemplated private placement.

30. Specifically, Noam Rubinstein of H.C. Wainwright, called Plaintiff about the Company's contemplated private placement.

31. During early stages of deal negotiations, Shamir asked whether the Company would

include warrants as part of the offering.

32. The Company, through Mr. Rubinstein, rejected Shamir's request and Mr. Rubinstein claimed, in sum or substance, that "the Board would not approve it."

33. Mr. Rubinstein further stated that the Company had been in discussions with another investor (or group of investors) earlier, but that those discussions had "died" because those investors (i) had insisted upon warrants, and (ii) wanted to invest more than $8 million (which was far more than the Company needed to fund its business for the next two years).

34. On or about February 24, 2020, the Company entered into Securities and Purchase Agreement with Plaintiff and other investors (the "SPA"), pursuant to which the Company issued one million shares at a price of $8 per share of common stock.

35. Pursuant to the terms of the SPA, the Company represented and warranted, *inter alia*, that:

- "[T]here are no . . . commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any Ordinary Shares or the capital stock of any Subsidiary, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional Ordinary Shares or Ordinary Share Equivalents or capital stock of any Subsidiary";

- "Except for the issuance of the Securities contemplated by this Agreement…no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries…that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least one (1) Trading Day prior to the date that this representation is made;"

- "All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company and its Subsidiaries,…does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in

light of the circumstances under which they were made, not misleading."

- "From the date hereof until the first year anniversary of the Closing Date, the Company shall be prohibited from effecting or entering into an agreement to effect the issuance by the Company . . . Ordinary Shares or Ordinary Share Equivalents (or a combination of units thereof) involving a Variable Rate Transaction," which was defined as "a transaction in which the Company (i) issues or sells any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional Ordinary Shares either (A) at a conversion price, exercise price or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the Ordinary Shares at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Ordinary Shares."

36. Pursuant to the terms of the SPA, and based on the oral representations made by the Company, Shamir participated in the February Offering and purchased 300,000 shares of the Company's common stock for $2.4 million.

***Defendant Enters into a Second Securities Purchase Agreement***

37. On Wednesday, February 26, 2020, the Company and Shamir (as well as other investors) closed on the February Offering.

38. On February 28, 2020, the Company's common stock closed at a price of $8.95 per share.

39. On March 1, 2020, a mere four days after the February Offering had closed, the Company entered into a new securities purchase agreement for a new offering to a new group of investors on new, and better, terms.

40. Unlike the February Offering, the March Offering offered investors both (i) registered shares of the Company's common stock, **and** (ii) warrants (the "Warrants") that entitled the warrant holder to purchase the Company's common stock at $9 per share (the "Exercise

Price").

41. In addition, investors were entitled to buy one share of common stock and one warrant to buy one share of common stock at a combined price of $8 per "unit"

42. The price of each "unit" was $0.95 below where the price for Enlivex's common shares had closed on Friday, February 28, 2020.

43. The Warrants were valid from the issuance date until two-years after the Closing Date.

44. Section 3 of the Warrants discussed "Certain Adjustments" that could be made to the Exercise Price under certain conditions. Among other things, Section 3 provided that:

> "If the Company, at any time while this Warrant is outstanding: (i) pays a share of dividend or otherwise makes a distribution or distributions in respect of the Company's Ordinary Shares . . . (ii) subdivides outstanding Ordinary Shares into a larger number of shares, (iii) combines . . . outstanding Ordinary Shares into a smaller amount of shares, or (iv) issues by reclassification of Ordinary Shares any shares of capital stock of the Company, then in each case the Exercise Price shall be multiplied by a fraction by which the numerator shall be the number of the Ordinary Shares . . . outstanding immediately before such event and of which the denominator shall be the number of Ordinary Shares outstanding immediately after such event. . . . Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification."

45. Ultimately, the Company sold 2,093,750 shares of its common stock, par value NIS 0.40 per share, and warrants that entitled the investors to purchase up to 2,093,750 of ordinary shares at $9 per share.

### *Defendant's Fraudulent Conduct*

46. Upon information and belief, Defendant was negotiating the terms of the March Offering ***prior to*** closing the February Offering and/or was aware of the potential terms of, and

investors in, the March Offering before the February Offering had closed.

47. Notably, the terms of the March Offering were different than the terms of the February Offering.

48. Upon information and belief, because the terms of the two offerings were different, the Company and the investors in the March Offering were required to negotiate, draft, review and execute a new securities purchase agreement (the "March SPA").

49. For example, the March SPA included numerous references to the Warrants. The SPA signed by Shamir (and other investors in the February Offering) obviously did not contain any references to Warrants because the Company did not offer any warrants in connection with the February Offering (despite Shamir's request).

50. The March SPA also included a provision that stated "[f]rom the date hereof until 75 days after the Closing Date, neither the Company nor any Subsidiary shall issue, enter into any agreement to issue or announce the issuance or proposed issuance of any Ordinary Shares or Ordinary Share Equivalents." That provision did not exist in SPA.

51. Upon information and belief, Defendant required more than two business days to (i) identify new investors, and (ii) negotiate an entirely new transaction (*i.e.*, the March Offering), (iii) draft and negotiate a new set of documents (including the Warrant), and (iv) execute those documents.

52. Thus, upon further information and belief, the Company knew (or had reason to know) that the March Offering was likely to close shortly after the February Offering had closed.

53. The Company, however, misled Shamir (despite its Code of Ethics, its Disclosure Policy and the plain and unambiguous terms of the SPA).

54. Specifically, the Company misled Shamir by representing to Shamir that (i) the

Board would not approve a transaction involving warrants, (ii) the Company had previously rejected overtures from another, larger investor because (x) that investor sought warrants, and (y) the Company did not need more than the $8 million it was raising in connection with the February Offering.

55. Moreover, the Company failed to tell Shamir that it was in the process of negotiating a subsequent offering, even though it knew, upon information and belief, that such a deal was imminent.

56. Had Shamir known that another issuance of stock was imminent (or even likely to occur in the not-too-distant future) and that the subsequent issuance would include Warrants, it would not have invested in the February Offering (including because (i) any immediate subsequent issuance would dilute Shamir's holdings when the Company had represented that it did not need to seek additional capital, and (ii) the Company had flatly rejected Shamir's request for Warrants on pretextual terms).

### *The March Offering Depresses the Company's Stock Price*

57. On or about March 2, 2020, the first trading day following the Company's execution of the March SPA, the Company announced the March Offering.

58. In pre-market trading on March 2, 2020, the Company's stock price declined fifteen percent (15%). By the close of trading on March 2, 2020, the Company's stock price was $7.00 per share (which constitutes more than a 20% drop from the prior day's close).

59. By March 19, 2020, the Company's stock price had declined to $3.77 per share.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
(Against Defendant)

60. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 59 as if fully set forth herein.

61. Defendant, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have (i) engaged in acts, practices and courses of business which operate as a fraud and deceit upon Shamir and other investors in connection with the February Offering, (ii) employed devices, schemes and artifices to defraud, and (iii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62. For example, Defendant knew, prior to Plaintiff's investment, that it was planning to enter into the March Offering and knowingly, or recklessly, disregarded its duty to provide accurate information, and correct false information, to Plaintiff and the investing public.

63. As set forth above and incorporated herein, Defendant engaged in a scheme to deceive Plaintiff and the market, and a course of conduct that duped Plaintiff into investing in the Company.

64. Defendant approved and controlled the misrepresentations alleged above and the failure to correct the information.

65. Defendant benefited from its failure to correct the material misrepresentations and/or omissions alleged above because had Defendant not made the misrepresentations, or corrected them when they became known, Plaintiff would not have invested in the Company.

66. By engaging in the foregoing conduct, Defendant violated Section 10(b) and 10b-5, and damaged Plaintiff.

67. As such, Plaintiff suffered monetary damages in an amount to be determined at trial but in no event less than $2.4 million as well as prejudgment interest.

## **AS AND FOR A SECOND CAUSE OF ACTION**
(Breach of Contract)

68. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 67 of this Complaint as if the allegations were fully set forth herein.

69. At all times relevant hereto, Plaintiff performed all of its obligations under the SPA, which is a binding and enforceable agreement between Plaintiff and the Company.

70. Pursuant to Section 3.1(g) of the SPA, "[T]here are no . . . commitments of any character whatsoever relating to, by which the Company or any Subsidiary is or may become bound to issue additional Ordinary Shares or Ordinary Share Equivalents or capital stock of any Subsidiary".

71. Pursuant to Section 3.1(i), the Company represented that "…no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries… that would be required to be disclosed by the Company at least one (1) Trading Day prior to the date that this representation is made:'

72. Pursuant to Section 3.1(y), the Company represented that "All of the disclosure furnished by or on behalf of the Company to the Purchasers… does not contain any untrue statement of a material fact or omit to state any material fact in light of the circumstances under which they were made, not misleading."

73. Pursuant to Section 4.12, the Company covenanted that "From the date hereof until

14

the first year anniversary of the Closing Date, the Company shall be prohibited from effecting or entering into an agreement to effect any issuance by the Company or any of its Subsidiaries of Ordinary Shares or Ordinary Share Equivalents (or a combination of units thereof) involving a Variable Rate Transaction… any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages."

74. Despite these representations and covenants, the Company (i) upon information and belief, knew prior to the closing of the SPA, that it was negotiating the March Offering (or something similar to it), and (ii) entered into the March Offering.

75. By failing to inform Plaintiff that the Company had plans surrounding the March Offering (or something similar to it) and that the March Offering would take place just days after the February Offering had closed, the Company breached the SPA.

76. The Company has no legitimate justification for its breaches of the SPA.

77. At all times relevant hereto, Shamir has complied with its obligations under the Agreement.

78. As a result of Company's breach, Plaintiff has been damaged by an amount to be determined at trial but in no event less than $2,400,000 as well as (i) pre-judgment interest, and (ii) Plaintiff's "reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of" this action as set forth in Section 5.9 of the SPA.

**AS AND FOR A THIRD CAUSE OF ACTION**
(Fraud in the Inducement)

79. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

15

80. Prior to signing the SPA, Defendant misrepresented material facts as to (i) the Company's ability to offer more shares of common stock and Warrants to the February Investors, and (ii) the Company's desire to take in more than $8 million of new capital.

81. Defendant made these misrepresentations and/or omitted material information with the knowledge that it would be offering better terms to a new set of investors only days later.

82. Plaintiff reasonably relied on Defendant's misrepresentations and omissions and, but for Defendant's misrepresentations and omissions, would not have entered into the SPA for the February Offering.

83. As a result of Plaintiff's reliance on Defendant's misrepresentations, Plaintiff suffered damages in the amount to be determined at trial, but in no event less than $2.4 million and prejudgment interest.

70. Defendant's conduct was wanton and egregious, and merits an award of punitive damages, including because, upon information and belief, (i) Defendant grossly misrepresented the Company's willingness to issue warrants, (ii) Defendant misrepresented the Company's willingness to take in additional capital, and (iii) by virtue of those misrepresentations, Defendant immediately diluted Plaintiff, devaluing Plaintiff's interest almost immediately after it had investment.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

i) On the First Cause of Action for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder, awarding Plaintiff monetary damages against Defendant, in an amount to be determined at trial but in no event less than $2.4 million, including interest thereon;

ii) On the Second Cause of Action for Breaches of Section 3.1(g), 3.1(i) and 3.1(y) of the SPA, awarding Plaintiff monetary damages against Defendant, in an amount to be determined at trial but in no event less that $2.4 million, including interest thereon;

iii) On the Third Cause of Action for Fraud in the Inducement, awarding Plaintiff (x) compensatory damages against Defendant, in an amount to be determined at trial but in no event less than $2.4 million, including interest thereon, and (y) punitive damages.

iv) Awarding Plaintiff such other relief as the Court may deem just and proper.

Dated: New York, New York
         May 13, 2020

                                        Respectfully submitted,

                                        **FEUERSTEIN KULICK LLP**

                                        By: _____
                                        David Feuerstein
                                        810 Seventh Avenue, 34th Floor
                                        New York, New York 10019
                                        Tel: (646) 793-3613
                                        david@dfmklaw.com

                                        *Attorneys for Plaintiff S.H.N Financial Investments Ltd.*